E. O. PICKERING, to the use of JOHN W. DRYDEN, Respondent, v. MIJAMAN TEMPLETON et al., Stockholders of the Mississippi Valley National Telegraph Company, Appellants.    E. O. PICKERING, to use, etc., Respondent, v. JAMES E. CARSTARPHEN, Stockholder, etc., Appellant. E. O. PICKERING, to use, etc., Respondent, v. GEORGE MARZOLF et al., Stockholders, etc., Appellants. E. O. PICKERING, to use, etc., Respondent, v. FRANK A. SUDA, Stockholder, etc., Appellant.

### June, 10, 1876.

1. A creditor of a corporation created in 1867 obtained judgment in 1870 against the corporation, and, on the return of *nulla bona* to an execution, prayed separate executions against the shareholders. *Held*, that the creditor was entitled to execution against each shareholder for the amount of his subscription remaining unpaid, and 100 per cent. on the original subscription. 2. That the failure of the corporation to complete the work for which the corporation was established, within a period named by its agent when soliciting subscriptions (such completion not being made a

condition of the subscription, and the shareholder by not paying his subscription having retarded the work), does not discharge the shareholder from liability to pay his subscription, nor from his obligation to satisfy the claims of its creditors.

2. The delivery by a corporation to its shareholders of certificates of paid-up stock, when only part of the par value has been paid, will not prevent a creditor of the corporation from showing the fact, and having execution against such shareholder.

3. The failure of the agent of a corporation to deliver to the corporation the original subscription paper will not discharge those who had signed that paper.

4. A subscriber to the stock of a company cannot plead, in avoidance of his liability thereon, that he merely signed, at the request of the solicitor for the company, as an inducement for others to subscribe.

5. To make a record valid on its face, it is only necessary that it should appear that the court had jurisdiction of the action and the parties, and that a judgment has in fact been rendered. All else is merely formal.

APPEAL from St. Louis Circuit Court. ·

*Affirmed.*

*Dyer & Emmons,* for appellants, cited : Rives *v.* Plank-road Co., 30 Ala. 92 ; Jenkins *v.* U. T. R. Co., 1 Caines' Cas. 86 ; Fiser *v.* M. & T. R. R. Co., 32 Miss. 359 ; Highland Turnpike Co. *v.* McKee, 11 Johns. 100 ; Graham T. Co. *v.* Hurtin, 9 Johns. 218 ; Hibernia T. Co. *v.* Henderson, 8 Serg. & R. 219.

*Dryden & Dryden,* for respondent, cited : Wag. Stat., p. 322, sec. 2 ; Daly *v.* Timon, 47 Mo. 516 ; West. Boatman Bank Assn. *v.* Kribben, 48 Mo. 37 ; Wight *v.* Shelby R. R. Co., 16 B. Mon. 4 ; Lowe *v.* E. & K. R. R. Co., 1 Head, 659 ; LaGrange Plank-road Co. *v.* Mays, 29 Mo. 64 ; Piscataqua F. Co. *v.* Jones, 39 N. H. 491 ; Smith *v.* Plank-road Co., 30 Ala. 650 ; Cunningham *v.* Edgefield, 2 Head, 23 ; Vicksburg S. & T. R R. Co. *v.* McKean, 12 La. An. 638 ; M. & O. R. R. Co. *v.* Cross, 20 Ark. 454 , White Mountain R. R. Co. *v.* Eastman, 34 N. H. 141 ; Mann *v.* Cooke, 20 Conn. 178 ; Ogilvie *v.* Knox Ins. Co., 22 How. 380 ; Shaeffer *v.* Home Ins. Co., 46 Mo. 248 ; Wag. Stat. 270, sec. 9 ; Prov. Savings Inst. *v.* Jackson Place Skating and Bathing Rink, 52 Mo. 552 ; Mann *v.* Pentz, 2 Sandf.

Ch. 257; Slee *v.* Bloom, 19 Johns. 456; Wood *v.* Dummer, 3 Mason, 308; Sawyer *v.* Hoag, 17 Wall. 610; Upton *v.* Hansborough, 5 C. L. N. 242; Upton, Assignee, *v.* Trebilcock (U. S. S. C., Oct. T., 1875), 8 C. L. N. 65; Webster *v.* Upton, Assignee (U. S. S. C., Oct. T., 1875), 9 C. L. N. 1835.

GANTT, P. J., delivered the opinion of the court.

These cases may be considered together.

The plaintiff, Pickering, sued the telegraph company, got. judgment at the April term, 1870, of the St. Louis Circuit. Court, and, an execution being returned *nulla bona*, etc., he moved the court for separate executions against the several defendants as stockholders of the company. It was alleged that the several defendants had only paid 50 per cent. of their subscriptions. The matter was referred to a. referee, and, on the coming in of his report, the court awarded executions against the several defendant stockholders for the amounts claimed by the plaintiff, who had, sometime before this award, assigned the original judgment to John W. Dryden.

All these defendant stockholders resided at the town of Louisiana, Missouri. When the building of the telegraph line was projected, in 1867, the president of the company visited Louisiana, and, after a short stay there, constituted Carstarphen the agent of the company to receive subscriptions at that place. Both the president and Carstarphen expressed confident expectations of the early completion of the work, and of the great profits that would ensue to the shareholders. They seem also to have believed that only a. percentage of the subscriptions would ever be needed. They expected the line to be completed in six months. Nothing of this expectation was incorporated in the terms of the subscription, and the plaintiff was a stranger to its. expression. Through various causes, one of which appears. to have been the slackness of the subscribers in paying their calls, the completion of the work was seriously delayed.

In 1868 the defendant subscribers appear to have paid nothing towards their respective subscriptions. In that year the home office issued certificates for the stock of each, placed them in the hands of a director, and he proceeded to Louisiana to make a settlement with the subscribers. When he convened them they at first flatly refused to pay anything, for the reason that the work had not been completed in six months. One of them claimed, in addition, that he had only signed the subscription paper to enable Carstarphen to get the names of some of his Dutch friends; that, in a few days, he called on Carstarphen and told him to strike off his name from the list, as he wished to have no more to do with it; and that Carstarphen did this. After some discussion Marzolf & Seibert paid 50 per cent. of their subscription, and received a certificate of full paid stock; Templeton & Gentry did the same; and Carstarphen, claiming a credit to the amount of 50 per cent. on account of services as agent, received also a certificate of full paid stock. None of these, however, had paid more than 50 per cent. on his or their subscription. Suda, who had subscribed as above shown, had paid nothing at all.

The original paper taken by Carstarphen has never been returned to the home office. It was claimed that, on this account, the subscription in each case was incomplete and not binding.

The referee found the facts above recited, and that the several defendants were liable for the amount unpaid on their several subscriptions, and 100 per cent. beside. Exceptions were duly saved, and the cases are before us on appeal from the judgment of the Circuit Court confirming the report of the referee and awarding execution accordingly.

1. We find no error in these records. The plaintiff was, in every instance, entitled to all that he claimed. There seems to be no ground for denying that Marzolf & Seibert, as well as Templeton & Gentry, did subscribe for the stock of the telegraph company, and that they only paid 50 per

cent. of the par value of their stock. They are, then, clearly liable to the creditors of the company for the balance remaining unpaid, and 100 per cent. additional (sec. 11 of ch. 62, General Statutes of Missouri, p. 328), unless for some of the causes alleged the subscription was a nullity. These causes are: (1) That the failure to complete the work within six months avoided the subscription; (2) that, admitting the subscription to be valid, the certificate and the agreement between the company and Templeton & Gentry and between the company and Marzolf & Seibert, that the stock was full paid, was conclusive as to the point; (3) that the failure to return the original subscription paper to the home office prevented the completion of the contract of subscription; (4) that, as to Suda, his withdrawal of his name, at the end of a few days, after it had been annexed to the subscription paper—acquiesced in, as it was claimed to have been, by Carstarphen—discharged him (Suda) altogether. We are of opinion that there is no validity in any of these causes.

2. As to the first, the excuse hardly becomes a person of adult years. One is impatient at being gravely told that the glowing anticipations of the projectors of a new enterprise were disappointed by the hard realities with which its promoters were compelled to struggle; that some of the calamities which every one of common sense knows to be inseparable from all human effort dimmed the practical triumph of the adventure. But, when those whose duty it was to furnish the capital for the work—the early completion of which was hoped for—have been delinquent, and yet complain that the work was not done without a check, it is with difficulty that the objection can be supposed to be seriously made.

In the present case, nothing seems to have been said which could, as between the company and the defendants, have amounted to a condition or qualification of the obligation of the subscribers. As against the company itself,

everything of this kind would have been closed when the certificates of stock were taken, in 1868, even if the early completion of the work had been a condition of the subscription. *A fortiori*, all disputes on this subject were made impossible, as far as creditors were concerned. We will not examine into the case of a subscription being vitiated by false representations, on the faith of which the subscription was made. No such case is before us.

3. Very little time need be spent in disposing of the second objection. To allow it would be to enable the members of a corporation to evade, by a declaration false in every particular, the plainest provisions of a statute passed to give security to its creditors.

4. The third point is of no force whatever. The contract of subscription was complete when it was received by the agent of the company. The subsequent casual or intentional destruction of the list, or the bad faith of Carstarphen toward his principals, could have no effect to liberate the stockholders from their obligations to the creditors of the corporation.

5. The special matter set up by Suda is equally bad in law and in morality — or, it is bad in law because it is condemned by morality. He seems to have lent his name to Carstarphen in order to allure other subscribers, under the agreement that, when this end had been served, his name was to come off the list. It would seem that Suda insisted that he did not sign the original subscription paper, but another—in order to facilitate the success of the scheme above stated. The referee, however, thinks that Mr. Suda is mistaken here, and we hope the referee is correct. The fact, if established as contended for by Mr. Suda, could not possibly serve for his legal extrication, and in other respects would be injurious to him. Of course Carstarphen had not, and could not possibly have had, power to make such a bargain with Suda as is above suggested, to the prejudice of

the creditors of the corporation. The authorities cited by respondent are decisive on all the points we have considered.

6. Another objection was made at the hearing which, it appears, was then urged for the first time. It is that the judgment in favor of Pickering and against the telegraph company was a nullity for want· of a finding for the plaintiff, Pickering. ·The objection being a formal one, it is necessary to set out the entry in which the supposed omission occurs :

·  "Ezrom O. Pickering *v.* The Mississippi Valley National Telegraph Company. Monday, May 9, 1870. Now, at this day, come the parties, by their attorneys, and, waiving a jury, this cause is submitted to the court upon the pleadings and proofs, and the court, after hearing the proofs, doth assess the damages of said plaintiff, by reason of the premises," etc. " It is, therefore, considered," etc.

It is conceded that this entry would have been above challenge if, between the words " doth " and " assess, " the further words " find the issues for the plaintiff, and, " had intervened. The want of these, it is urged, makes the entry a nullity. We cannot assent to this view. In the first place, the statute of jeofails (sec. 19, ch. 168, General Statutes of Missouri, p. 671) declares that, after verdict, " judgment shall not be staid, nor shall the judgment upon such verdict * * * be reversed, impaired, or in any way affected by reason * * * of any informality in entering a judgment, or making up the record thereof. " ·Here, indeed, the appellant insists that the ·" verdict" is the particular thing omitted ; that there is no finding for the plaintiff. But is this correct? We think not. The cause was submitted to the court, sitting as a jury, by both parties. That the court found for the plaintiff is clear ; for it could not otherwise have proceeded to assess the damages in his favor. The error, if error there be, consists in the

misprision of the clerk in making the entry. But the section just quoted goes on to declare that the record shall not be held to be defective "for any other default or negligence of any clerk or officer of the court   \*   \*   \*   by which neither party shall have been prejudiced." Nothing is plainer than that neither party was in fact prejudiced by the informality complained of. The defendant (the telegraph company) appears to have been wholly insensible to it; and when the case was taken to the Supreme Court, and various errors were assigned, no mention was made of this. The Supreme Court, at the March term, 1871, directly affirmed this judgment, which, when impeached in a collateral way, we are asked to declare a nullity from the beginning. We cannot do this. We rather think that, when the case was before the Supreme Court (47 Mo. 45), the record was criticised and examined under a motion in arrest of judgment. But, in the second place, if this point has been made and urged with all conceivable persistency, we do not think it could at any stage have availed the objector.

Had it been made timefully indeed—that is to say, at the April term, 1870, of the St. Louis Circuit Court—it would have been commendable for that tribunal to have ordered a formal correction of the record by supplying an ellipsis plainly suggested by the context, according to section 20 of chapter 168, page 671. But without this the entry may defy challenge. Since the luminous decision in *Grignon's Lessee* v. *Astor*, 2 How. 319, this matter has hardly been open to doubt, though the question has often been brought up anew, and received the same determination. See *Maxwell* v. *Stewart*, 22 Wall. 77, and *Martin* v. *McLean*, 49 Mo. 361— not to pause on intermediate cases. The terse language of the present chief justice of the Supreme Court of the United States (22 Wall. 79, above quoted) is, "to make   \*   \*   \* a record valid upon its face it is only necessary for it to appear that the court had jurisdiction of the subject-matter

of the action and of the parties, and that a judgment had in fact been rendered; all else is form only."

The judgment is affirmed. Judge BAKEWELL concurs; Judge LEWIS not sitting.